UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| John Benson and Brian Benson, | CIVIL NO. 17-3839 (MJD/DTS) |
| Plaintiffs, | |
| v. | ORDER & REPORT AND RECOMMENDATION |
| Ann Kemske and Jon Kemske, | |
| Defendants. | |

John Benson, 12200 Marion Lane West, # 5309, Minnetonka, Minnesota 55305, pro se Plaintiff.

Brian Benson, 3893 Cross Street SW, Prior Lake, Minnesota 55372, pro se Plaintiff.

David C. McLaughlin and Jason G. Lina, Fluegel Anderson McLaughlin & Brutlag, 25 2nd Street NW, Suite 102, Ortonville, Minnesota 56278, for Defendants.

## INTRODUCTION

This is an action, primarily for damages, based on claims of fraud and conversion. The parties are all related to each other by blood or marriage, a circumstance that drives a good deal of the fervor that has characterized this litigation. Plaintiffs allege Defendants have cheated them out of mineral rights in the Bakken oil fields in North Dakota, causing them several million dollars in damages. Defendants claim this allegation is not only specious and offensive but has been (or should have been) the subject of litigation that took place in McKenzie County, North Dakota and concluded (after three separate appeals) in the North Dakota Supreme Court. Defendants assert this action must be dismissed because it is barred by the doctrines of *Rooker-Feldman* or *res judicata*, or by Plaintiffs' failure to join a necessary party. The Court finds that none of these doctrines

applies here and recommends the motion to dismiss be denied with respect to Plaintiffs' damage claims. Plaintiff's declaratory judgment claim, however, is barred by *res judicata* and should be dismissed. Plaintiffs have also moved to disqualify Defendants' counsel, which motion is denied.

## FINDINGS OF FACT

This lawsuit relates to the disposition of certain mineral rights in 160 acres of land located in McKenzie County, North Dakota.[1] The disputed mineral rights were originally owned by the paternal grandparents of Plaintiff John Benson and Defendant Ann Kemske, but were deeded to the couple's five grandchildren[2] in undivided equal shares. That is, each grandchild owned an undivided 1/5 share in the mineral rights associated with the 160 acres. This lawsuit concerns Ann Kemske's undivided 1/5 share in these mineral rights. Amd. Compl., Dckt. No. 168.

By quit claim deed dated December 13, 1990, Ann Kemske and her husband Jon Kemske conveyed "all their right, title and interest" in the 160 acres to her uncle, Thomas Benson, Ann Kemske's uncle and John Benson's father. Though Thomas Benson filed a "statement of claim of mineral interest" in 2005, the 1990 deed itself was not recorded in the office of the recorder for McKenzie County until April 9, 2012. Two years before that deed was recorded, on April 15, 2010, Ann Kemske executed a mineral deed conveying all of her right title and interest in 1,720 acres of land in McKenzie County, including the 160 acres described above, to Family Tree Corporation, Inc. (Family Tree). Family

---

[1] Unless otherwise noted, this statement of facts is taken directly from the opinion of the North Dakota Supreme Court reported at 875 N.W. 2d 510 (N.D. 2016).

[2] The five grandchildren are Edward Benson, John Benson, Louise Benson, Geri Benson and Ann Kemske, *nee* Pflueger.

Tree recorded this deed on May 12, 2010, and then immediately conveyed 24 net mineral acres in the 160 acres to Desert Partners IV, L.P. (Desert Partners). The mineral deed to Desert Partners was recorded on June 2, 2010.[3]

In January 2013, the oil companies sued several defendants, including Thomas Benson, John Benson, Brian Benson and the Kemskes, to quiet title to their mineral interests in the 160 acres. On July 24, 2013, John Benson filed an action in Hennepin County District Court against the Kemskes seeking a declaration that the Kemskes' deed to Family Tree was invalid and that title to the 160 acres and the mineral rights had passed to Thomas Benson who then passed title to John Benson and his son Brian Benson. Lina Aff. Ex A, Dckt. No. 171-2. The complaint did not claim fraud or conversion or seek money damages against the Kemskes, nor did it name any of the oil companies as defendants. *Id.*

The Hennepin County District Court dismissed Benson's complaint finding that the Court did not have *in rem* jurisdiction over the North Dakota property and that necessary parties (Family Tree and Desert Partners) were not joined and could not be joined because they did not reside in Minnesota. *Id.*, Ex B. Specifically, the court noted, "a judgment entered by this Court (Hennepin County District Court) in regards to mineral rights in the North Dakota property would not affect title to that land." *Id.* Thereafter, the issue of title to the land and the disputed mineral rights was litigated in state court in McKenzie County, North Dakota.

---

[3] Family Tree and Desert Partners are hereafter referred to collectively as "the oil companies."

3

For several years, the quiet title action proceeded in North Dakota state court. The Bensons answered the complaint and counterclaimed seeking a declaration that the Kemskes' deed to Family Tree was invalid, null and void; that title to the land and mineral rights be quieted in the Bensons; and that the oil companies be forever barred from asserting title to the mineral rights. *Id.*, ex. C. The Bensons did not assert a claim for any relief against the Kemskes. *Id.* Initially, the trial court entered summary judgement in favor of the oil companies, but that judgment was reversed by the North Dakota Supreme Court because the Bensons had not received proper notice of the hearing on the motion. *See Desert Partners IV, L.P. v. Benson*, 855 N.W. 2d 608, 614 (N.D. 2014).

When the quiet title action returned to the trial court, the court again entered summary judgment for the oil companies, finding they were good faith purchasers for value and therefore had title to the disputed mineral rights. *See Desert Partners IV, L.P. v. Benson*, 875 N.W. 2d 510, 512-13 (N.D. 2016). This judgement too was reversed by the North Dakota Supreme Court because there were genuine disputes of material fact regarding whether the oil companies—who had actual notice of the 2005 "statement of claim of mineral interest" that had been filed by Thomas Benson—had made proper inquiry into the Kemskes' ability to convey title to the land:

> . . . the statement of claim imposed a duty of further inquiry on Family Tree to ascertain the state of ownership of the disputed mineral interests, and Family Tree is deemed to have constructive notice of the facts an inquiry would have revealed. We therefore conclude there are disputed issues of material fact involving whether the plaintiffs were good-faith purchasers for valuable consideration of the disputed mineral interests.

875 N.W.2d at 515.

4

The case was remanded for a bench trial on the issue of the oil companies' inquiry into the facts surrounding the 2005 statement of claim and their knowledge of the Kemskes' ability to convey good title to the mineral rights. On October 3, 2017 the trial court—over Benson's objection—proceeded with a bench trial in the quiet title action and determined that ". . . on the basis of the testimony and evidence, Family Tree and Desert Partners acted in good faith in purchasing Kemske's minerals." *Desert partners IV, L.P. v. Benson*, 921 N.W. 2d 444, 450 (N.D. 2019). The North Dakota Supreme affirmed the trial court's finding and judgment. *Id.*

Shortly before the trial, on August 18, 2017, John Benson filed this action naming the Kemskes, Family Tree Corporation, Inc., Desert Partners IV, L.P., Brigham Oil & Gas, L.P., and Oasis Petroleum Inc. as defendants. Benson's original complaint alleged four counts: Count 1 sought a declaration under the federal Declaratory Judgments Act, 28 U.S.C. § 2201, and Minnesota Declaratory Judgments Act, Minn. Stat. §§ 555.01-.16, that because the original Quitclaim Deeds created an undivided interest, none of the five Benson grandchildren could sell any of their interests without the consent of the other four grandchildren or by Thomas Benson as Power of Attorney (Compl. ¶¶ 84-85.); Count 2 sought supplementary relief, based on the declaratory judgment, for a money judgment against Oasis to release to John Benson and Brian Benson any money held in suspense related to the Subject Mineral Interest based on his allegation that he and Brian Benson were the legal owners of the Subject Mineral Interest (Compl. ¶ 106.); Count 3 sought supplementary relief, based on the declaratory judgment, for a money judgment against Family Tree and for any amounts Family Tree had received from Oasis and/or SM Energy, less the amounts paid to Geri Benson, based on his allegation that he is the owner of the

5

mineral interests previously conveyed by Geri Benson to Family Tree and to rescind the grant to Family Tree (Compl. ¶¶ 109-13.); Count 4 requested a temporary restraining order and/or an injunction staying the North Dakota trial pending a ruling by this Court. (Compl. ¶ 115.).

By order dated October 27, 2017, the Court denied Benson's request to enjoin the North Dakota trial.[4] Order, Dckt. No. 58. On November 9, 2017, the Court dismissed Oasis as a defendant pursuant to stipulation. Order, Dckt. No. 60. After myriad procedural wranglings by the parties, this Court dismissed Family Tree and Desert Partners IV for lack of personal jurisdiction. Order, Dckt. No. 132. In December 2018, Brigham Oil and Gas was also dismissed as a defendant, leaving only the Kemskes, who had answered Benson's original complaint on September 11, 2017, as defendants.

In January 2020—again after considerable procedural machinations—the parties stipulated to an amendment of the complaint to add Benson's son, Brian, as a plaintiff and to add claims for fraud and conversion. Stipulation, Dckt. No. 154. Though Benson initially moved to add the Kemskes' law firm, Fluegel, Anderson, McLaughlin, and Brutlag (FAMB), as a named defendant, he withdrew that motion when it was pointed out to him that FAMB's joinder would destroy this Court's diversity jurisdiction. Dckt. No. 167.

The Amended Complaint, filed January 9, 2020, is now the operative complaint in this matter. The Amended Complaint names only the Kemskes as defendants, though it factually alleges negligence by FAMB for failing to record the 1990 deed to Thomas Benson. As against the Kemskes, the Bensons allege that by executing the 2010 mineral

---

[4] On the eve of trial, Benson—through an intermediary—claimed he was hospitalized and unable to proceed with the trial. The trial court proceeded nonetheless, which decision was affirmed by the North Dakota Supreme Court. 921 N.W. 2d at 448.

6

deed to Family Tree, the Kemskes committed fraud and conversion, for which the Bensons seek compensatory and punitive damages. Amd. Cmpl. ¶¶ 32-41, Dckt. No. 168. The Bensons have also included a claim for a declaratory judgment that the "attempted conveyance" in 2010 "is void as a matter of law." *Id.* ¶ 45.

The Kemskes move to dismiss the Amended Complaint in its entirety, arguing that the action is barred by *Rooker-Feldman, res judicata* and failure to join a necessary party, FAMB. The Bensons have moved to disqualify FAMB from further representation of the Kemskes in this action.

## CONCLUSIONS OF LAW

### I.   The *Rooker-Feldman* Doctrine Does Not Bar the Present Action

The *Rooker-Feldman* Doctrine originates from two United States Supreme Court decisions, *Rooker v. Fidelity Trust Company*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The doctrine, in essence, prohibits a state court loser from seeking a better outcome in federal district court. The *Rooker-Feldman* Doctrine "precludes a federal action if the relief requested in the federal court case would effectively reverse the state court decision or void its ruling." *Neal v. Wilson*, 112 F.3d 351, 357 (8th Cir. 1997). Because the doctrine is a jurisdictional one it may be raised *sua sponte* by the court. *Lemonds v. St. Louis Cty.*, 242 F.3d 488, 492 (8th Cir. 2000), *cert. denied* 531 U.S. 1183 (2001). Ultimately, *Rooker-Feldman* is a rule of comity and federalism that is designed to preserve the sanctity of state court judgments.

The Kemskes argue, without analysis, that the *Rooker-Feldman* Doctrine bars the Bensons' federal lawsuit. The Kemskes' brief in support of its *Rooker-Feldman* argument is long on rhetoric but short on analysis, making such pronouncements as:

7

- [Benson] is essentially trying to have this Court overrule the North Dakota Supreme Court. [(p. 6)]

- . . . Mr. Benson is attempting to do an end-run around the North Dakota Supreme Court. [(p. 7)]

- The North Dakota Supreme court did not give him more bites at an apple that, by now, is reduced to a rotten core. [*Id.*]

- After dates in Hennepin County District Court, North Dakota District Court, and multiple visits to the North Dakota Supreme court in Bismark, Mr. Benson [cannot bring] his traveling roadshow to . . . the District of Minnesota. [*Id.*]

The Court well understands the Kemskes' frustration with the pace and proliferation of this litigation, but the argument based on *Rooker-Feldman* does not withstand scrutiny. The argument, reduced to its essence is this: because the prior state court litigation touched upon the 2010 deed from the Kemskes to the oil companies, any judgment in this case would necessarily impugn the North Dakota state court judgment. This argument is misplaced, both as a matter of fact and as a matter of law.

To begin, the *Rooker-Feldman* Doctrine does not bar a federal action that is initiated during the pendency of a state court action, even if the state court action proceeds to judgment first. In *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), Justice Ginsburg, writing for a unanimous Supreme Court, held that *Rooker-Feldman* did not bar a federal action filed just weeks after a state court action was commenced in Delaware:

> When there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court. This Court has repeatedly held that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the federal court having jurisdiction.' . . . comity or abstention doctrines may, in

8

> various circumstances permit or require the federal court to stay or dismiss the federal action in favor of the state court litigation . . . but neither *Rooker* nor *Feldman* support the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court. . . . disposition of the federal action, once the state court adjudication is complete would be governed by preclusion law.

544 U.S. at 292-93 (citations omitted).

This is precisely the situation here. Benson initiated this action in federal court during the pendency of the state court action. In fact, he sought to enjoin the North Dakota trial, but was denied when this Court declined to interfere in that process. The Kemskes could have moved to stay this case pending the outcome in state court but did not do so; the Kemskes could have sought dismissal on the basis of alleged claim splitting but, again, did not do so. Subsequent to the state court judgment, this Court dismissed several defendants on the basis of personal jurisdiction. But the Kemskes chose to answer Benson's federal complaint. As Justice Ginsburg made clear, timing is everything.[5] The fact that a state court judgment was later entered by the trial court and affirmed by the North Dakota Supreme Court does not make *Rooker-Feldman* applicable to this action. Rather, as Justice Ginsburg observed in *Exxon Mobile*, now that the state court action has reached final judgment, this case is governed by preclusion law, the application of which is considered below.

Even if the timing problem did not exist and this action had been filed after the state court judgment, *Rooker-Feldman* would not apply. This Court is not acting as an

---

[5] The Kemskes' brief seemingly acknowledges the importance of timing when it argues "attempts to secure review of a state court order by filing a later action in [federal court] are usually barred by a lack of jurisdiction under [*Rooker-Feldman*]." p. 7.

9

appellate court reviewing the judgment of the North Dakota trial or Supreme Court. The judgment in the state action quieted title to the mineral rights as between the oil companies and Benson. That judgment was expressly and exclusively premised on the finding that the oil companies were good-faith purchasers for value from the Kemskes in 2010. A money judgment in this case finding that the Kemskes defrauded Benson or converted his property will in no way impugn or disturb the North Dakota judgment.[6] The North Dakota courts simply found that, notwithstanding the 1990 deed from the Kemskes to Thomas Benson, the oil companies had title to the mineral rights because they had no notice—actual or constructive—of it. The Bensons' damage theory in this case assumes the validity of the quiet-title judgment—by effectively deeding the mineral rights to the oil Companies in 2010, the Kemskes committed fraud and conversion. There is nothing inconsistent between the Bensons' damages claim here and the North Dakota judgment. In short, *Rooker-Feldman* does not apply, and would not bar this action even if it did.

## II.  Neither *Res Judicata* Nor Claim Splitting Bars the Bensons' Fraud and Conversion Claims

The application of *res judicata* to this action is governed by North Dakota law. *St Paul Fire and Marine Ins. Co. v. Compaq Computer Corp.*, 539 F.3d 809, 821 (8th Cir. 2008). As the Eighth Circuit held in *Lasse v. Cty. of Isanti*, 638 F.3d 853, 856 (2011):

> By enacting the Full Faith and Credit Statute, 28 U.S.C. § 1738, 'Congress has specifically required all federal courts to give preclusive effect to state court judgments whenever

---

[6] This is not true of the declaratory relief sought in Count III, but as Justice Ginsburg noted in *Exxon-Mobile*, that is an issue governed not by *Rooker-Feldman*, but by preclusion law. Further discussion of that issue is therefore deferred to the section containing this Court's analysis of preclusion.

10

> the courts of the state from which the judgments emerged would do so.'

Thus, the law of the forum that rendered the first judgment, here North Dakota, controls the *res judicata* analysis. *St Paul Fire and Marine*, 539 F.3d at 821. Logically—especially under North Dakota law—the same is true for the claim splitting analysis.

Under North Dakota law, *res judicata* is considered a subset of a broader doctrine it labels "claim splitting." *See Lucas v. Porter*, 755 N.W.2d 88, 93-94 (N.D. 2008). When a claimant splits its claim between concurrent lawsuits, North Dakota law applies the doctrine of claim splitting under what it calls a "rule of abatement"; when a claimant splits its claim between successive lawsuits, North Dakota law applies the doctrine under the rule labeled *res judicata*; "abatement" and "*res judicata*" are subsets of the umbrella doctrine, "claim splitting." Because this case involves successive litigations, this court will simply refer to "*res judicata*."

*Res judicata* under North Dakota law has four elements: (1) a final decision on the merits in the first action by a court of competent jurisdiction; (2) the second action involves the same parties (or their privies); (3) the second action raises an issue actually litigated or which should[7] have been litigated in the first action; and (4) an identity of the causes of action. *See Mo. Breaks, LLC v. Burns*, 791 N.W.2d 33, 39 (N.D. 2010).

The first two elements of *res judicata* are obviously present here. There has been a final decision on the merits in the quiet-title action in the North Dakota trial court, which

---

[7] Numerous decisions from the North Dakota courts have described this element as whether the issue was actually litigated or "could have been litigated in the first action." However, a close reading of those cases makes it clear that the issue had to be one which was required to (*i.e.* "should") have been raised in the original action.

11

judgment was affirmed by the North Dakota Supreme Court. The parties to this case, "the second action,"—the Kemskes and the Bensons—were involved in the state court action.

The third and fourth elements, however, are absent here. The third element, that this case raises a claim that was actually litigated or was required to be litigated in the quiet-title action, is not met. The question whether the Kemskes committed fraud or conversion by deeding the mineral rights to the oil companies in 2010 was not actually litigated in the North Dakota quiet title action between the oil companies and the defendants. That action quieted title to the mineral rights as between the Bensons and the oil companies who were found to be good faith purchasers for value from the Kemskes. The quiet-title action turned on whether, because of the 2005 statement of claim, the oil companies had actual or constructive notice of the 1990 deed. *See Desert Partners IV*, 875 N.W.2d at 515. That is, the North Dakota action resolved the question whether the *oil companies* acted fraudulently or in bad faith, not whether the *Kemskes* did. Whether in 2010 the Kemskes committed fraud or converted the Bensons' property was not actually litigated and decided in the North Dakota action.

However, whether the Kemskes' 1990 quit-claim deed to Thomas Benson transferred mineral rights in the 160 acres was actually litigated and decided—in Benson's favor. In *Desert Partners IV, LLP v. Benson*, 875 N.W.2d 510 (2016) (*Desert Partners IV, II*), the North Dakota Supreme Court unequivocally found:

> . . . the Kemskes executed a deed conveying and quit claiming all their right, title, and interest in the 160 acres to Thomas Benson in 1990, but that deed was not recorded until 2012. That deed is valid between the parties to the instrument [Thomas Benson and the Kemskes] and those with notice. N.D.C.C. § 4719-46. The record also includes a 'statement of claim of mineral interests' for the disputed mineral interests in the 160 acres, which was recorded in the office of the recorder

12

<pre>                    for McKenzie County on November 3, 2005, before Ann
                    Kemske conveyed mineral interests to Family Tree in 2010.</pre>

875 N.W.2d at 514-15. The question the trial resolved was whether the oil companies had notice of the 1990 deed.

This finding is consistent with North Dakota law, which holds that "a general conveyance of land without any exception or reservation of minerals carries with it the minerals as well as the surface." *Schulz v. Hauck*, 312 N.W.2d 360, 361-62 (N.D. 1981). The 1990 deed from Ann Kemske to Thomas Benson, apparently contained no such reservation. 875 N.W.2d at 514-15.

Nor is this finding mere dicta. In the Amended Complaint in this action, the Bensons allege that the Kemskes' Answer in the quiet-title action raised this very issue: "The Kemskes also answered [the quiet-title complaint], claiming their 1990 deed to Thomas Benson was intended to convey only their surface rights to the 160 acres and not mineral rights." Amd. Compl. ¶ 26, Dckt. No. 168. In their Answer and Counterclaim, the Bensons expressly disputed that the 1990 deed contained any such reservation of mineral rights. Lina Aff., Ex. C., Dckt. No. 171-2. The Kemskes have admitted in this action that the scope of the 1990 deed was actually litigated in the quiet-title action. Br. at 4-5, Dckt. No. 171. For these reasons, the North Dakota Supreme Court has stated in its decisions in other, later cases, that it in fact had decided this issue in the quiet-title action:

> This court determined the deed [from the Kemskes to Thomas Benson in 1990] was valid between the parties to the instrument and those with notice, and the statement of claim imposed a duty of further inquiry to ascertain the state of ownership of the disputed mineral interests.

*Sundance Oil & Gas, LLC v. Hess*, 903 N.W.2d 712, 719 (N.D. 2017). Thus, it was determined that the Kemskes' 1990 deed to Thomas Benson conveyed the mineral

13

interest in the 160 acres to Thomas Benson. The quiet-title action did not determine whether, in light of that finding, the 2010 deed to the oil companies defrauded the Bensons or converted their property. Since this issue was not actually litigated, the question is whether it should have been litigated in the quiet-title action such that *res judicata* bars the Bensons' damage claims here. As discussed below, because the Bensons' claims for damages were not required to be litigated in the quiet-title action, *res judicata* does not bar them here.

North Dakota Century Code § 32-17-08 governs quiet-title actions. To understand the impact of this statute on the application of *res judicata* requires a careful reading of its provisions. Section 32-17-08 provides that in a quiet-title action the defendant "may set forth a counterclaim and recovery from plaintiff or a co-defendant. A defendant may set forth the defendant's right in the property as a counterclaim and may demand affirmative relief against the plaintiff and co-defendant, and in such case the defendant also may set forth a counterclaim and recovery from a plaintiff or a co-defendant for permanent improvements made by the defendant. . . ." N.D.C.C. § 13-17-08. The statute permits a defendant to assert his right to title in "the subject property" as a counterclaim rather than simply an affirmative defense. By definition, a defendant's title to the property that is the subject of the litigation is necessarily litigated in a quiet-title action; the statute merely permits it to be asserted in the form of a counterclaim or a defense. The statute also permits, but does not require, a defendant in a quiet-title action to assert a "counterclaim" for affirmative relief against a co-defendant.[8] But nothing in the language

---

[8] The Court understands the reference to a "counterclaim" against a co-defendant to be what is denominated a "cross-claim" under the Federal Rules of Civil Procedure.

14

of the statute *requires* a defendant assert a cross-claim for damages. Nor have any of the parties cited any case to this Court suggesting that the Bensons' fraud and conversion claims were required to be litigated in the quiet-title action brought by the oil companies.

In fact, such a result would seem illogical. The quiet-title action determines who has title to the mineral rights. Unless and until it is determined that the oil companies have title to those rights, the Bensons' claims for damages are, at best, inchoate. The Bensons' damage claims only come home to roost if and when the oil companies prevail in the quiet-title action.

For this same reason, this case does not meet the fourth element of *res judicata*, the identity of the causes of action. The cause of action in the quiet-title case was to determine who now owned title to the mineral rights. The Bensons' fraud and conversion claims are distinctly different. This action litigates whether the Kemskes' conduct in 2010 was wrongful and caused harm to the Bensons. For these reasons the doctrine of *res judicata* does not apply to bar the current action for damages against the Kemskes. Counts I and II may properly proceed.

In addition to their claims for damages, however, the Bensons have also sought a declaration that "the subject property [the 160 acres] is owned as an undivided interest, and that any attempt at conveyance without the consent of all owners [*e.g.* the 2010 deed] as void as a matter of law." Amd. Compl. ¶ 45, Dckt. No. 168. This claim for declaratory relief was—and was required to be—actually litigated in the North Dakota action. Such a declaration directly conflicts with the North Dakota judgment and cannot proceed. Accordingly, the Third Claim in the Amended Complaint is barred by *res judicata*.

III. **The Kemskes' Argument for Dismissal Based on a Failure to Join a Necessary Party is Meritless**

15

The Kemskes also argue this case must be dismissed for failure to join FAMB, the law firm whom Benson claims negligently failed to file the 1990 quit-claim deed. This argument fails for several reasons.

To begin, Federal Rule of Civil Procedure 19(a)(1) provides that:

> A person who is subject to service of process and whose joinder will not deprive the Court of subject-matter jurisdiction must be joined as a party if:
> (A) in that person's absence the Court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Kemskes' argument is premised on the fact that the Bensons' Amended Complaint makes a factual allegation that the original law firm was negligent by failing to record the 1990 quit-claim deed. In 1990 the allegedly negligent lawyer, Robert Pflueger, practiced in a law firm named Pflueger, Kuhn, McLaughlin (PKM). That firm ceased to exist in 1993 when its three lawyers joined FAMB. Even assuming FAMB is somehow legally liable for PKM's negligence, FAMB is not a necessary party. FAMB does not claim an interest relating to the subject matter of the action. Nor does its absence from this case leave either the Kemskes or Bensons subject to any risk of double, multiple, or otherwise inconsistent obligations. Therefore, FAMB is not a necessary party under Rule 19(a)(1)(B).

It cannot be credibly argued that in FAMB's absence "the Court cannot accord complete relief among the existing parties." The existing parties to the lawsuit are the

16

Kemskes and the Bensons. The Bensons claim damages due to the Kemskes' 2010 conveyance of mineral rights to the oil companies. The Kemskes and the Bensons will obtain complete relief as between them when this case is litigated to its conclusion. If the Kemskes are found to have committed fraud or conversion the Bensons will have a money judgment; if not, the Kemskes will not be liable.

Moreover, any negligence potentially attributable to FAMB from the failure to record the 1990 deed was known to the Bensons by at least 2013 (if not before) when the quiet-title action was commenced. Under Minnesota's statute of limitations for legal malpractice, Minn. Stat. § 541.05, subd. 1(5), any such liability is extinguished. *See also Antone v. Mirviss*, 720 N.W.2d 331 (Minn. 2006). Therefore, FAMB cannot be held liable for this negligence and it cannot be a necessary party to this action. The mere fact that the Bensons made a factual assertion in their Amended Complaint that FAMB was negligent does not make them a necessary party. FAMB's argument (on behalf of the Kemskes) that it is a necessary party is a transparent attempt to destroy diversity jurisdiction. But under the Rule, even if FAMB were "a necessary party" whose joinder is not feasible because it would destroy this Court's jurisdiction, the remedy would not be dismissal of the action. Where joinder of a necessary party is not feasible, the Court may proceed with the existing parties based upon certain factors enumerated in F.R.C.P. 19(b), which in this case clearly weigh heavily against dismissal. Because FAMB is not a necessary party, however, the Court will not undertake a detailed 19(b) analysis. Dismissal on the basis of FAMB's absence is unwarranted and the motion should be denied.

**IV.   The Bensons' Motion to Disqualify FAMB**

17

In a twist of self-injurious irony, the Bensons move to disqualify FAMB due to their interest in the outcome of this action. *See* Dckt. No. 181. The argument to disqualify FAMB is twofold. First, the Bensons claim that FAMB formerly represented John Benson in connection with his father's estate and therefore cannot represent the Kemskes in the current action adverse to John Benson. Second, the Bensons assert that it is clearly in the Kemskes' legal interest to make FAMB a party to the case so as to "mitigate" the Kemskes' liability.

The first argument for disqualification is without merit, has already been rejected by this Court, *See* Order, Dckt. No. 68, and therefore, merits no further comment.

The second argument, that FAMB must be disqualified due to its former partner's alleged negligence, is equally without merit. Rule 1.7 of the Minnesota Rules of Professional conduct provides, in pertinent part, that "a lawyer shall not represent a client if . . . there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer."

The Bensons theorize that FAMB may be financially responsible for the alleged negligence of its former partner for representation he provided before he was associated with FAMB. As FAMB points out, this argument comes perilously close to asserting that FAMB is a necessary party to the litigation. Fortunately, the argument is no more meritorious coming from their opponent. There is no basis on which the Court could conclude that FAMB's legal liability risk is anything more than theoretical. The alleged conduct occurred in 1990, twenty-seven years before the filing of this action. At the time, the allegedly negligent attorney was in a different law firm that did not merge with or become acquired by FAMB. There is no basis on which to conclude that FAMB has

successor liability for decades old alleged legal malpractice. Moreover, as already noted, the statute of limitations has passed on any such potential liability. Therefore, this alleged personal interest in the litigation does not exist.

The only other manner in which the alleged negligence of Attorney Pflueger gives rise to some personal interest by FAMB or its attorneys in this case would be that it not dishonor the memory of a former partner or besmirch its own present reputation. Simply stated, this potential interest is too distant, too ephemeral, and too speculative to require disqualification of FAMB.[9] On this record there is simply no basis on which this Court could properly find that FAMB's representation is materially limited by its interests in the matter.

## ORDER

For the reasons set forth above, IT IS HEREBY ORDERED:

1.  Plaintiff's motion to disqualify counsel (Dckt. No. 180) is DENIED.

2.  The Court will conduct a telephonic status conference on **June 11, 2020** at 1:30 PM to set the schedule for the remainder of the case. All parties are expected to attend prepared to discuss remaining discovery and a date for trial.

---

[9] The Court notes that Attorney Robert Pflueger was Ms. Kemske's father. Any concerns that the law firm might have regarding this matter are no doubt well known to Ms. Kemske.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS: Defendants' Motion to Dismiss (Dckt. No. 170) be granted in part and denied in part as follows:

1. Defendants' motion to dismiss Plaintiffs' claim for declaratory relief be granted; and

2. Defendants' motion to dismiss Plaintiffs' claims for fraud and conversion be denied.

Dated: June 2, 2020                                    s/David T. Schultz
                                                      DAVID T. SCHULTZ
                                                      U.S. Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).